Maddest, Judge,
delivered the opinion of the court:
On September 15,1947, the Government sold to the plaintiff a quantity of barbed wire estimated at 2,100 long tons, at a price of $120 per ton. The wire was located at Shaiba *49 Depot, in Iraq. The written contract of sale contained the following provision:
The Seller guarantees that permission to export the property has been granted by the Iraqi Government.
The plaintiff paid the Government $252,000 for the wire, and removed it from the Shaiba Depot to Basrah, Iraq, where it was placed in storage. The plaintiff promptly began to attempt to resell the wire to a foreign purchaser, but did not succeed in finding one until September 1948. At that time it agreed upon terms of sale with a purchaser, subject to inspection by the purchaser, the seller to guarantee shipment within 60 days after the purchaser established credit. In order to be in a position to make this sale, the plaintiff applied to the proper authorities in Iraq for permission to export the wire. That permission was refused.
On October 21, 1948 the plaintiff advised the Government that it had been definitely denied the right to export the wire; that this was a breach of the plaintiff’s contract with the Government, which breach canceled the contract. The plaintiff demanded from the Government the return of the purchase price, plus the plaintiff’s moving and storage expenses. Such a claim was filed with the Comptroller General of the United States who, on June 22, 1949, denied it. The plaintiff advised the Government that it was attempting to resell the wire in order to mitigate damages. The Government responded that it had no interest in the wire, but agreed that if the plaintiff resold it, that fact would be without prejudice to whatever rights the plaintiff might be held to have against the Government, except that the resale price should be credited to the Government in case the plaintiff recovered in a suit on the contract.
The plaintiff in 1950 obtained an export permit from Iraq and in 1951 sold the wire to a purchaser in India. The price received was $128,695.02 less than what the plaintiff had paid the Government for the wire plus its costs for moving, storing, obtaining permission to export, and delivering the wire. The plaintiff sues for that amount.
The plaintiff’s claim is based upon an interpretation of the language quoted above, which appeared in its purchase contract, which would in effect make that language mean that *50 the Government guaranteed that the Iraqi Government would continue to permit the exportation of the wire for whatever time it might take the plaintiff to make a satisfactory resale of the wire. It says that this was the intention of the parties at the time the contract was made and the language was written.
The negotiations which led to the contract took place in Cairo, Egypt, in September 1947. At that time the parties to the negotiation knew that the plaintiff wanted to purchase the wire for resale and hoped to resell it before exporting it; that the Surplus Property Act of 1944 prohibited the purchaser from importing the wire into the United States; that some time would be required for the plaintiff to resell the wire and export it from Iraq; that it had required some 18 months for the plaintiff to consummate the resale and export of some surplus property which the plaintiff had purchased from the Government in Europe; that the Government was having some difficulty in obtaining permission from the Government of Iraq to export another lot of barbed wire which had been sold to the Government of Southern Rhodesia. The parties also knew that on September 1, 1947, a Special Committee on Palestine of the United Nations had issued a report containing recommendations for the partition of Palestine; that mass meetings and other demonstrations of protest against this report had occurred in Iraq, Egypt, and elsewhere; that there was unrest in the Arab world over the issue and open talk that armed conflict would result if the recommendations of the Special Committee were carried into effect.
The negotiations were carried on with the foregoing facts in the minds of the parties. The language already quoted,
The Seller guarantees that permission to export the property has been granted by the Iraqi Government.
was inserted in the contract, as it was in all such contracts made during that period in countries where the Government knew, from previous experience, that a buyer of surplus property might have difficulty in exporting it without aid from our Government in obtaining an export permit.
On its face, the quoted language is a mere assurance of an existing fact, and would leave interested parties to draw *51 their own conclusions and make their own predictions as to how long this fact would continue to be a fact. It is difficult to see how an experienced person such as the plaintiff’s vice-president, who conducted the negotiation for the plaintiff, and who had recently had great difficulty in arranging for the export of surplus property from a European country, could have read into the contract language more than it said. But the plaintiff has insisted strenuously that the contract language, in the circumstances, was intended by the parties to embody a condition subsequent, entitling the buyer to rescind the contract and be placed in statu quo ante if, at any time in the future, the plaintiff desired to export the property and was not permitted to do so.
Because of this insistence we directed a second hearing of the case to permit the plaintiff to prove, if it could, that in spite of the words of the contract, its meaning to the parties was that which the plaintiff urged that it was. The evidence taken in the second hearing does not satisfy us that the language meant anything substantially different from what it said.
The plaintiff points to the answer given by Mr. Dechert, the Government’s negotiator in the transaction, when he was asked whether the plaintiff’s negotiators were particularly interested in securing some guarantees with respect to exportation from Iraq. The answer was:
I got the impression that their primary concern was to buy the barbed wire, but a condition of their buying it was their ability — they did not want to buy it unless they felt reasonably sure they could export it after they had sold it.
This answer confirms the fact, which really required no confirmation, because it would necessarily have been in the minds of intelligent and informed negotiators at that time and in that place, that the matter of being allowed to export the wire was of prime importance. But it does not prove that the contract provision which they got, at the end of the negotiation, was meant to be a guaranty that they would still be able to export the wire whenever they desired to do so.
The sale was a cash sale, with immediate delivery to the purchaser, who caused the property to be removed from the *52 Government’s Shaiba Depot to a storage place hired by the plaintiff at Margil Wharf in Basrah, Iraq. The moving cost the plaintiff $7,176.11. Storage charges began immediately to accrue. Yet the plaintiff says the Government would not know, perhaps for years, whether the wire had been sold at all, or not. If the condition subsequent, lack of an export permit, should occur, the Government would find that the money it received for the wire would have to be refunded, it would have to pay for the moving, which was of no benefit to it, and the storage, which was apparently of no benefit to it. And whether this condition subsequent occurred or not would be completely beyond the control of the Government. No reasonably prudent individual would make such a bargain for himself, and no competent Government agent would make such a bargain for the Government. A court should not saddle a Government agent with the responsibility for having made such a bargain for the Government, when the contract which he prepared and signed does not express such a bargain, and the evidence is insufficient to persuade the court that such a bargain was intended.
The plaintff’s petition will be dismissed.
It is so ordered.
Laramore, Judge; Whitaker, Judge; LittletoN, Judge; and Jokes, Ohief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. During the first nine months of 1947 defendant (acting through the Central Field Commissioner for the Africa Middle East, Persian Gulf Command Area, Office of the Foreign Liquidation Commissioner, Department of State) had in Iraq various items of property for sale under the Surplus Property Act of 1944. Among the items was a quantity of barbed wire estimated at approximately 4,000 tons.
*53 2. At all times material to this action the Government of Iraq was a sovereign power, duly constituted and having authority to forbid the exportation of property from its territorial limits.
3. During the spring and summer of 1947 defendant sold most of the surplus property it had in Iraq. Some of the purchasers wanted to export the items they had bought. Permission for such export had to be obtained from the Government of Iraq. In the course of these transactions prior to July 1947, defendant found it necessary to obtain, or to assist the purchasers in obtaining, the permission of the Iraqi Government to export the items so sold.
In July 1947, following conversations on the highest diplomatic level in Iraq, an understanding was reached between the Government of that country and representatives of the United States whereby the Government of Iraq agreed that surplus property sold by defendant from its stock in Iraq could be exported from that country if certain conditions had been fulfilled. The conditions were that the items should first be offered to Iraq, for purchase by the Government or by a citizen of that country; and, if Iraq did not agree to purchase or provide a purchaser within a limited, stated time (indicated as being two weeks or less), then defendant’s bill of sale to another purchaser would be honored for an export permit.
4. On September 1, 1947, a Special Committee on Palestine of the United Nations issued a report containing recommendations for the partition of Palestine. Mass meetings and other demonstrations of protest against this report occurred in Iraq, Egypt, and elsewhere, in the early part of September 1947. There was unrest in the Arab world over the issue, and open talk that armed conflict would result from implementation of the committee recommendations.[1] These facts were known to the representatives of plaintiff and defendant who later negotiated the contract in suit.
*54 5. After the understanding described in finding 3 bad been reached, defendant negotiated sales of the barbed wire, which was stored at Shaiba Depot. One sale, for approximately half of the wire, was negotiated with the Government of Southern Rhodesia. The agreement of sale was executed in September 1947, and the sale to Southern Rhodesia was consummated. Defendant negotiated three or four sales of the remaining half of the wire, but none of the purchasers was able to obtain sufficient dollars, and all of the sales fell through.
6. (a) In September 1947, two representatives of plaintiff (an Illinois corporation engaged in buying and reselling surplus commodities) called on defendant’s representative in Cairo, Egypt, for the purpose of ascertaining what surplus property, if any, was available through that office. At that time the Cairo office had disposed of most of the surplus items in its charge, and preparations were being made for closing the office. While plaintiff’s representatives were in conversation with defendant’s representative in the latter’s office, a telephone conversation took place in the course of which defendant’s representative mentioned barbed wire. Plaintiff’s representatives followed up the reference by expressing interest in the wire, if any was available for purchase by plaintiff.
(b) Defendant’s representative explained to plaintiff’s representatives the situation in relation to the barbed wire: that it had been sold, in two parts; that the sale of one part (to Southern Rhodesia) was virtually certain; that there was some uncertainty about completing the sale of the other part, because of the would-be buyer’s inability to obtain dollars. Defendant’s representative then asked if plaintiff could deposit ten percent of the purchase price, if it should develop that some of the wire was available. Plaintiff’s representatives replied that they would pay the whole price in dollars and at once.
7. (a) In the course of the conversations (which were held intermittently over four or five days) plaintiff’s principal representative (a vice-president of the corporation) [2] spoke *55 of Ms dealings with defendant’s Paris office.[3] He also advised defendant’s representative that plaintiff’s purpose in buying the barbed wire would be to resell it; and that plaintiff would expect to resell the wire before moving it out of Iraq. He then asked if plaintiff could get an export permit.
(b) Defendant’s representative explained to plaintiff’s vice-president the difficulties that had been encountered in respect to the issuance of export permits by the Iraqi Government and the steps that had been taken to overcome those difficulties. He told plaintiff’s vice-president that Iraq had had the refusal of the barbed wire, and that defendant was in a position to assure the issuance of an export permit in accordance with the arrangement between the United States and Iraq.[4]
8. On September 15,1947, plaintiff and defendant entered into a contract whereby defendant, acting pursuant to the Surplus Property Act of 1944, sold to plaintiff the quantity of barbed wire remaining unsold as described in finding 5. The quantity was estimated to be 2,100 long tons, and the sale price was $120 per ton. A copy of the contract is in evidence as plaintiff’s Exhibit No. 1, and is incorporated herein by reference.
9. The contract, which was prepared by defendant, contained the following provisions:
Article One. Warranty. — The Seller agrees to * * * sell to the Buyer “as is, where is” and without warranty except as to title, and subject to the conditions hereinafter set forth, and the Buyer agrees to * * * purchase from the Seller, certain movable property * * *.
*56 Article Two. Title. — Title to the property hereby sold shall pass to the Buyer upon the execution and delivery of this contract.
Article Three. Delivery and Removal. — Delivery and removal of the property hereby sold shall take place at its present location within 40 days after payment has been made in accordance with the provisions of Article Four hereof and upon proper proof that customs duties and taxes, if any, have been paid in accordance with Article Six hereof, or that proof satisfactory to the Seller has been produced that the Buyer has obtained the permission of the Government in interest to export the aforesaid property. In the event of failure on the part of the Buyer to remove the property hereby sold within the time specified herein or any extension thereof, the Seller, after ten days written notice to the Buyer, may dispose of the property as it sees fit (including destruction or abandonment) and the Buyer shall be liable for any expenses incident thereto.
Article Five. Transportation. — The Buyer will furnish and pay for all transportation necessary for the removal of the property hereby sold.
Article Eight. Applicable Law. — This contract shall be interpreted in accordance with the laws of the United States of America, as the same exist in the District of Columbia.
Article Eleven. Special Conditions. — Quantities of the items listed * * * are approximate only. Any variation between the quantities stated * * * and the quantity actually delivered * * * , will be adjusted at * * * unit cost * * *.
The Seller guarantees that permission to export the property * * * has been granted by the Iraqi Government.
The text of Article Eleven had been prepared by defendant and was typed into the printed form.
10. The provision in Article 11 whereby defendant guaranteed that permission to export the property had been granted was a provision in standard use by defendant in sales made in countries where defendant knew, from previous experience, that a buyer of surplus property who wanted to export it might have difficulty in doing so without aid from the United States Government in obtaining the export permit. Iraq was such a country. Egypt was another.
*57 11. Plaintiff duly paid for the wire, accepted delivery and removed it from the Shaiba Depot to storage at Margil Wharf in Basrah, Iraq. The fair and reasonable cost of moving the wire to storage, which was paid by plaintiff, was $7,176.17.
12. Plaintiff promptly commenced negotiations for the sale of the wire in South America. Negotiations which looked promising in October 1947 failed within a few weeks when the prospective buyer was unable to establish credit satisfactory to plaintiff.
13. On February 27, 1948, plaintiff wrote defendant that the amount of wire actually delivered was 1,616.85 long tons instead of 2,100 long tons and asked for a refund.
14. On May 14, 1948, the Government of Iraq proclaimed martial law. This was an act of sovereignty.
15. On May 24, 1948, defendant replied to plaintiff’s request for a refund, stating (in part):
* * * It has been determined, due to short deliveries, that you are entitled to a refund of $57,978.
Since the above determination has been made, this office has adopted a policy that the beneficiary of all refunds must first execute a release form, such as is attached hereto.[5] It is, therefore, requested that an appropriate official of your company execute the form in duplicate. As soon as we are in receipt of this form the necessary action will be taken to effectuate the refund.
16. On May 25, 1948, the Iraqi military authorities prohibited the sale, transfer, or export of a variety of military items, including barbed wire, except with the authorization of the Ministry of Defense. This was an act of sovereignty. Thereafter, plaintiff’s agent duly registered the wire with the military authorities in Iraq, in conformity with the requirements of the Iraqi Government.
17. On June 1, 1948, a duly authorized representative of plaintiff executed and forwarded to defendant the following release:[6]
*58 I * * * for and in consideration of a refund under Contract * * * dated 15 September 1947, in the sum of $57,978 * * * to me paid or to be paid * * * for and in behalf of the United States * * * release and forever discharge the * * * United States, of and from all manner of cause or causes of action, claims, or demands growing out of said Contract. * * *
This was the release form enclosed in defendant’s letter of May 24,1948, quoted in finding 15 above.[7]
18. Plaintiff had paid to defendant, on account of the estimated 2,100 long tons of wire, the sum of $252,000. After the release described in the preceding finding was received by defendant, a refund was made to plaintiff of $57,978. Plaintiff was thereafter in the position of having paid $194,022 for 1,616.85 long tons of wire.
19. (a) By letter dated July 10, 1948, plaintiff’s vice-president informed defendant of the advice received from plaintiff’s agent in a letter dated June 29, 1948, concerning the declaration of martial law in Iraq, the necessity for registering the wire, and the restrictions imposed upon its export, and further stated that:
We are quite disturbed by this due to the fact that we are now negotiating a sale for at least a portion, and possibly the entire parcel, to a European customer who has not as yet given us detailed shipping instructions, but these are expected by cable during the coming week.
We would like for you to advise us whether any special steps should be taken to protect our interests. If so, whom we should address.
(b) On July 12, 1948, plaintiff’s vice-president wrote to a representative of the United States then connected with the American Mission for Aid to Greece:
For your information, we are having quite a time on our barbed wire at Basrah. We have never been able to sell it due to difficulties in getting it inspected by prospective customers, and now the people who are storing it there for us advise that they have had to report it to the Iraq Government because it is war material, and we are fearful that it may be commandeered. We have this matter up with the State Department as to just what action we should take. * * *
*59 (c) On July 21,1948, plaintiff’s vice-president again wrote to defendant as follows (in part) :
* * * We are anxious to know if we will be restrained from shipping this property.
* * * We would certainly like some sort of ruling from your department as to what our rights are and what steps we should take to protect them, if any, particularly whether we are definitely restricted from shipping this property.
(d) On July 26, 1948, defendant wrote plaintiff as follows (in part):
* * * You have asked us to advise you whether any special steps should be taken to protect your interests.
In the present state of events we have, of course, no basis for approaching the Iraqi Government in your behalf. Whenever your company desires to clear the shipment of your barbed wire with the Iraqi and difficulty of any sort arises, * * * [the] Commercial Attache, and the American Embassy at Baghdad will cordially, we are sure, render you every assistance possible. * * *
20. During July and August 1948, plaintiff negotiated for the sale of the wire to S. A. Boeresake Fed. Ko-op. The terms of sale were agreed upon subject to inspection by the purchaser, seller to guarantee shipment within 60 days after credit was established, and to post a five percent performance bond. Plaintiff guaranteed inspection transportation expenses up to $1,600 to be forfeited if the wire was not as specified and granted Boeresake an option until September 15, 1948, to inspect the wire. To be in a position to accept the foregoing terms plaintiff, by its agent in the early part of September 1948, applied to the proper authorities in Iraq for permission to export the wire. On September 12,1948, the Commander of the Military Forces in the Third Martial Area, Iraq, refused to permit the export of the wire.
21. At a conference with representatives of defendant on September 23, 1948, plaintiff’s vice-president requested defendant to have the American Embassy approach the Iraqi Government and attempt to have it release its restrictions upon the exportation of the wire. On October 1, 1948, the American Embassy in Baghdad was requested to do so. It replied under date of October 13, 1948, that it had deter *60 mined not to approach the Ministry of Defense on this matter for the following reasons: (a) informal contacts with representatives of the Iraqi Government established that they felt that plaintiff should have exported between September 15, 1947, and May 25, 1948, when exportation was permissible; (b) intense anti-American feeling existed in the Iraq Army for what it considered to be American support of Iraq’s enemies in Palestine; and (c) public and military opinion was further worked up by recent disclosures that barbed wire licensed for export to Italy had been reexported to Israel.
22. By letter dated October 18, 1948, plaintiff further advised defendant of the difficulties encountered in selling the wire because of the restriction on export, and added:
We are now negotiating on this material with a purchaser in South Africa and are unable to assure them that we can make delivery as in order to accept their offer we must guarantee shipment and post a performance bond, all of which we are unable to do on account of the foregoing restrictions. * * *
Our purchase contract guaranteed by you our right to ship the material and if we are not to be permitted to do so we ask that you please advise what steps we should take to recover the purchase price and other incidental expenses we have been put to in connection with the transaction.
23. On October 20,1948, the substance of the message from the American Embassy in Baghdad, described in finding 21, was given to plaintiff’s vice-president with advice that defendant was prepared to make another approach to the Iraqi Government upon being advised as to the name of the prospective purchaser and the country to which the wire was to be exported. Defendant’s representative suggested that the chances of favorable consideration would be increased if plaintiff’s purchaser would have his government give assurances to the Iraqi Government that the wire would not be reexported to Palestine.
24. (a) On October 21,1948, plaintiff telegraphed defendant as follows (in part):
Eeference * * * your suggestion we furnish statement from customers guaranteed by their government that wire was for use in South Africa and would not *61 be re-exported we feel that time element involved such proceedings would be interminable and that as your sales contract guaranteeing export was unqualified as to destination we are not obligated to obtain governmental guarantees from any country. * * * We are now definitely denied * * * right of export * * * by Iraqi military * * *. * * * This breaches our contract and therefore cancels contract and we request we be reimbursed for our purchase price plus moving and storage expenses * * *.
Plaintiff thereafter never adopted the suggestion contained in the last sentence of finding 23.
(b) On November 19, 1948, plaintiff again wrote defendant, reviewing the history of the transaction, and said:
We ask that you take this letter as a formal claim * * * for a refund * * * of the entire purchase price * * * plus moving expenses, storage expenses since September 12, 1948 * * * together with all damages sustained * * * in connection with the resale * * *.
Meanwhile, the undersigned is holding said barbed wire * * * for your account and risk, and will take such steps on your behalf as may be possible to mitigate damages * * *.
25. A claim for refund of the purchase price and other charges incurred in connection with the wire was filed by plaintiff with the Comptroller General of the United States, and was denied by him on June 22,1949.
26. Pursuant to plaintiff’s statements set forth in finding 24 above, counsel for plaintiff in June 1949, April 1950, and October 1950, notified defendant that plaintiff was engaged in negotiations and would attempt to sell the wire to mitigate damages. Defendant informed plaintiff that it took the position that it had no interest in the wire but agreed that a sale by plaintiff would be without prejudice to the position taken by plaintiff in this litigation provided proper credit be given defendant in the event plaintiff recovered in this action. None of these negotiations developed into sales.
27. Plaintiff exercised diligence in seeking an export permit from Iraq, and on September 9,1950, its agent obtained permit number 27152 from the Finance Minister, Iraq, which stated in part:
*62 It has been decided to permit Puran Singh and Partner’s Transport and Contract Company, Basrah, to export 1,600 * * * tons of barbed wires which is a part of the twelve thousand tons which the Committee has already permitted to be exported vide its Decision Nos. Ill and 164 of 1947, provided that the export should be to outside Iraq excepting Palestine.
This permission shall be considered to be in force for four months with effect from its above date.
28.Plaintiff exercised diligence in selling the wire and in obtaining the best price it could. Plaintiff sold the wire in January 1951, at approximately $121 per long ton to Khan-delwal Bros. Ltd., Bombay, India, for $196,794.43 delivered in Bombay, which was a fair and reasonable price. Plaintiff incurred the following expenses which were fair, reasonable, and necessary in connection with the purchase, moving, storage, selling (including expenses aggregating more than $2,000 incurred in connection with unsuccessful attempt to consummate sales), obtaining permission to export, and delivering the wire:
Purchase price paid defendant_$194, 022.00
Expense of moving, storage, selling, permission to export and delivering wire_ [1]126,467.45
320,489.45
Plaintiff received from Khandelwal Bros. Ltd_ 196,794.43
Net claim of plaintiff_ 123,695.02
29. Defendant has not refunded plaintiff’s purchase price, nor has it reimbursed plaintiff for the expenses incurred and paid by plaintiff in moving, storing, and selling the wire.
30. (a) When the contract was negotiated, both parties knew that some time probably would elapse before a permit to export the wire from Iraq would be used. Labor conditions and shipping facilities in Iraq were such that the wire probably could not have been removed in a matter of days; and if plaintiff allowed the wire to remain in Iraq until a resale of it had been consummated (as both parties knew plaintiff intended to do), the time that would elapse *63 before export would extend from several weeks to several months.
(b) When the guarantee clause was inserted in Article 11 (that permission to export had been granted by Iraq), both parties expected that the Government of Iraq would abide by the commitment it had made with the United States. Neither of the parties intended or understood the defendant was undertaking a warranty against changes in conditions by reason of which Iraq might forbid export based on a change in national policy unrelated to the bona ftdes of its commitment to the United States.
(c) The actions of the Government of Iraq, in proclaiming martial law on May 14, 1948, in prohibiting the sale, transfer, or export of a variety of military items, including barbed wire, on May 25, 1948, and in refusing permission to plaintiff on September 12, 1948, to export the wire, were related to changes in conditions that had developed after July 1947 (when Iraq made its commitment with the United States relating to the export of surplus property) and after September 1947 (when the contract in suit was negotiated). None of the acts of Iraq hereinabove listed was an infringement upon its good faith in its commitment to the United States of July 1947.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is dismissed.

 The animus of the Arabs was at this time directed largely toward the British (and, as always, toward the Israelis). No official announcement of position regarding the partition issue was made by the United States until October 1947, after the contract in suit had[1] been made.

 References hereinafter to plaintiff’s vice-president are to the same individual.

 Plaintiff’s vice-president testified that lie told defendant’s representative that 15 or 18 months were being consumed in the effort to resell some of the items purchased through the Paris office. Plaintiff now relies on this testimony to establish as the intention of the parties, in the contract of sale hereinafter described, that defendant’s guarantee of an export permit would continue for such time as might be required to resell the wire, and that 15 or 18 months was understood to be a reasonable time for such guarantee to continue.
Defendant’s representative testified that he would not question the testimony given by plaintiff’s vice-president, but that he (defendant’s representative) had no recollection of references in the conversations to any specific transaction ; that he recalled only his impression of the extent of the knowledge of plaintiff’s vice-president of the personnel of the Paris office and of defendant’s office procedures generally.

 Both parties knew that the Surplus Property Act of 1944 prohibited importation of the wire into the United States.

 It is not established by tbe evidence that tbe policy so adopted, or the release form submitted to and subsequently executed by plaintiff, bore any relation to the action of the Iraqi Government in proclaiming martial law or in subsequently forbidding the export of military items.

 In executing this release, plaintiff was not advertent to possible claims growing out of action by the Government of Iraq in forbidding the export of military items.

 It is not established by the evidence that there was any monetary consideration for the release.

 This sum includes the amount specified in finding 11.